# 21-2526-cv

## United States Court of Appeals
*for the*
## Second Circuit

BUILDING AND REALTY INSTITUTE OF WESTCHESTER AND PUTNAM COUNTIES, INC., APARTMENT OWNERS ADVISORY COUNCIL, COOPERATIVE AND CONDOMINIUM COUNCIL, STEPPING STONES ASSOCIATES, L.P., LISA DEROSA, as Principal of Stepping Stones, L.P., JEFFERSON HOUSE ASSOCIATES, L.P., SHUB KARMAN, INC., DILARE, INC., PROPERTY MANAGEMENT ASSOCIATES, NILSEN MANAGEMENT CO., INC.,

*Plaintiffs-Appellants,*

– v. –

STATE OF NEW YORK, RUTHANNE VISNAUSKAS, in her official capacity as Commissioner of New York State Homes and Community Renewal, DIVISION OF HOMES AND COMMUNITY RENEWAL,

*Defendants-Appellees,*

COMMUNITY VOICES HEARD (CVH),

*Intervenor-Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR INTERVENOR-DEFENDANT-APPELLEE

JUDITH A. GOLDINER
EDWARD J. JOSEPHSON
THE LEGAL AID SOCIETY
199 Water Street
New York, New York 10038
(212) 577-3300

CAITLIN J. HALLIGAN
SEAN P. BALDWIN
MICHAEL DUKE
BABAK GHAFARZADE
SOPHIE LIPMAN
SAMUEL BREIDBART
EKATERINA STYNES
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

*Attorneys for Intervenor-Defendant-Appellee*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Intervenor-Defendant-Appellee state that nongovernmental corporate entity Community Voices Heard has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 5

STATEMENT OF THE CASE .......... 6

A. New York's Rent Stabilization Laws .......... 6

B. Proceedings Below .......... 11

SUMMARY OF THE ARGUMENT .......... 12

ARGUMENT .......... 15

I. The District Court Applied the Correct Standard of Review to the Motion to Dismiss .......... 15

II. Appellants Misstate the Applicable Standard for a Facial Challenge .......... 16

III. The 2019 Amendments Do Not Effect Physical Takings of Any Appellants' Properties .......... 19

A. Appellants Do Not Plausibly Allege a Facial Physical Taking .......... 19

1. The 2019 Amendments Do Not Compel Physical Occupation, and They Preserve Lawful Means to End a Tenancy or Remove a Property from the Rental Market .......... 20

2. Appellants' Attacks on the Available Exit Options Fall Flat .......... 27

B. Appellants Do Not Plausibly Allege Any As-Applied Physical Takings .......... 29

IV. The 2019 Amendments Do Not Effect a Regulatory Taking on Their Face or As Applied to Any Appellant's Property .......... 30

A. Appellants' Claims Are Not Ripe .......... 30

B. The Complaint Fails to Establish Any *Penn Central* Factor on a Facial Basis or As Applied ........ 32

1. The 2019 Amendments Do Not Have a Substantial Economic Impact on All Owners or Any Appellant ........ 32

2. The 2019 Amendments Do Not Interfere with Investment-Backed Expectations of All Owners or Any Appellant ........ 36

3. The 2019 Amendments Did Not Transform the RSL's Character from a Land-Use Regulation into a Taking ........ 38

C. Appellants' Attempts to End-Run *Penn Central* Fail ........ 41

V. Appellants Do Not Allege a Violation of Substantive Due Process ........ 43

A. Rational-Basis Review Governs Appellants' Due Process Claim ........ 43

B. The RSL Easily Passes Rational-Basis Review ........ 44

VI. The Complaint Fails to Allege Any Violation of the Contract Clause ........ 49

CONCLUSION ........ 52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1256 Hertel Ave. Assocs., LLC v. Calloway*,
761 F.3d 252 (2d Cir. 2014) ....................32, 39

*335-7 LLC v. City of New York*,
524 F. Supp. 3d 316 (S.D.N.Y. 2021) ....................2

*AFSCME Loc. 818 Waterbury City Emps. Ass'n v. City of Waterbury*,
198 F. App'x 47 (2d Cir. 2006) ....................16

*In re AIG Advisor Grp. Sec. Litig.*,
309 F. App'x 495 (2d Cir. 2009) ....................16

*Allen v. Cuomo*,
100 F.3d 253 (2d Cir. 1996) ....................36

*Allied Structural Steel Co.* v. *Spannaus*,
438 U.S. 234 (1978)....................27

*Appolo Fuels, Inc. v. United States*,
381 F.3d 1338 (Fed. Cir. 2004) ....................34

*Beatie v. City of New York*,
123 F.3d 707 (2d Cir. 1997) ....................44, 45, 47

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016) ....................17

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019)....................16

*Buffalo Teachers Fed'n v. Tobe*,
464 F.3d 362 (2d Cir. 2006) ....................27, 30, 32, 39

*Carriage House Realty Co. v. Conlon*,
487 N.Y.S.2d 971 (Yonkers City Ct. 1985) ....................28

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021)....................25, 26, 27

*CFCU Cmty. Credit Union v. Hayward*,
552 F.3d 253 (2d Cir. 2009) ....................................................................14, 49

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015)...............................................................................18, 19

*Cmty. Hous. Improvement Program v. City of New York*,
492 F. Supp. 3d 33 (E.D.N.Y. 2020) ....................................................................2

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*,
508 U.S. 602 (1993)...........................................................................................34

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*,
915 F. Supp. 2d 574 (S.D.N.Y. 2013) ..................................................................17

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*,
138 F. Supp. 3d 352 (S.D.N.Y. 2015) ..................................................................17

*Conn. Ass'n of Health Care Facilities, Inc. v. Bremby*,
519 F. App'x 44 (2d Cir. 2013) ...........................................................................22

*Connolly v. McCall*,
254 F.3d 36 (2d Cir. 2001) .................................................................................45

*Connolly v. Pension Benefit Guar. Corp.*,
475 U.S. 211 (1986)...................................................................................*passim*

*Dickerson v. Napolitano*,
604 F.3d 732 (2d Cir. 2010) ...............................................................................16

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) ...........................................................................17

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)...........................................................................................42

*People ex rel. Durham Realty Corp. v. La Fetra*,
230 N.Y. 429 (1921) ..............................................................................................6

*Eberhart v. Crozier*,
423 F. App'x 57 (2d Cir. 2011) ...........................................................................16

*Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*,
459 U.S. 400 (1983)....................................................................49, 50, 52

*Exxon Corp. v. Governor of Md.*,
437 U.S. 117 (1978)...............................................................................48

*Fanelli v. N.Y.C. Conciliation & Appeals Bd.*,
90 A.D.2d 756 (1st Dep't 1982) ..........................................................28

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993)..........................................................................46, 47

*Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
83 F.3d 45 (2d Cir. 1996) .................................................................*passim*

*Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
87 N.Y.2d 325 (1995)...........................................................................24

*Gonzalez v. Option One Mortg. Corp.*,
2014 WL 2475893 (D. Conn. June 3, 2014)...........................................16

*Greystone Hotel Co. v. City of New York*,
1999 U.S. App. LEXIS 14960 (2d Cir. June 23, 1999)........................3, 25

*Hadacheck v. Sebastian*,
239 U.S. 394 (1915)...............................................................................34

*Harmon v. Markus*,
412 F. App'x 420 (2d Cir. 2011) .........................................................*passim*

*Harris v. Israel*,
191 A.D.3d 468 (1st Dep't 2021) .........................................................26

*Heart of Atlanta Motel, Inc. v. United States*,
379 U.S. 241 (1964)...............................................................................20

*Heller v. Doe*,
509 U.S. 312 (1993)....................................................................44, 45, 48

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
452 U.S. 264 (1981)...............................................................................29

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987)....................................................30, 40, 41, 52

*Kittay v. Giuliani*,
252 F.3d 645 (2d Cir. 2001) ....................................................16

*Knick v. Township of Scott*,
139 S. Ct. 2162 (2019)....................................................31

*Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*,
959 F.2d 395 (2d Cir. 1992) ....................................................15, 38, 50

*La Guardia v. Cavanaugh*,
53 N.Y.2d 67 (1981)....................................................7, 9, 47

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005)....................................................*passim*

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982)....................................................23, 24

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)....................................................41

*Meriden Tr. & Safe Deposit Co. v. FDIC*,
62 F.3d 449 (2d Cir. 1995) ....................................................37

*MHC Fin. Ltd. P'ship v. City of San Rafael*,
714 F.3d 1118 (9th Cir. 2013) ....................................................34

*Murphy v. New Milford Zoning Comm'n*,
402 F.3d 342 (2d Cir. 2005) ....................................................32

*Murr v. Wisconsin*,
137 S. Ct. 1933 (2017)....................................................14, 39

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ....................................................16

*Nollan v. Cal. Coastal Comm'n*,
483 U.S. 825 (1987)....................................................42

*Nordlinger v. Hahn*,
505 U.S. 1 (1992)....................................................................................45

*Pa. Coal Co. v. Mahon*,
260 U.S. 393 (1922)................................................................................40

*Pakdel v. City and County of San Francisco*,
141 S. Ct. 2226 (2021)......................................................................26, 30

*Park Ave. Tower Assocs. v. City of New York*,
746 F.2d 135 (2d Cir. 1984) ...............................................................35, 36, 42

*Peckham v. Calogero*,
54 A.D.3d 27 (1st Dep't 2009) ...........................................................8, 22

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978)............................................................................3, 38

*Pennell v. City of San Jose*,
485 U.S. 1 (1988)...........................................................................29, 44, 45

*Petworth Holdings, LLC v. Bowser*,
308 F. Supp. 3d 347 (D.D.C. 2018).....................................................32, 33

*Preseault v. I.C.C.*,
494 U.S. 1 (1990).................................................................................44, 47

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980)..................................................................................26

*Pulte Home Corp. v. Montgomery County*,
909 F.3d 685 (4th Cir. 2018) ...................................................................34

*Rancho de Calistoga v. City of Calistoga*,
800 F.3d 1083 (9th Cir. 2015) .................................................................35

*Regina Metro Co. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
35 N.Y.3d 332 (2020) ..............................................................................38

*Rent Stabilization Ass'n of the City of N.Y. v. Dinkins*,
5 F.3d 591 (2d Cir. 1993) ..................................................................*passim*

*Rent Stabilization Ass'n of N.Y.C., Inc. v. Higgins*,
83 N.Y.2d 156 (1993) .......... *passim*

*Roberts v. Tishman Speyer Props., L.P.*,
13 N.Y.3d 270 (2009) .......... 9

*Sadowsky v. City of New York*,
732 F.2d 312 (2d Cir. 1984) .......... 4

*Seawall Associates v. City of New York*,
74 N.Y.2d 92 (1989) .......... 25, 42, 43

*Sensational Smiles, LLC v. Mullen*,
793 F.3d 281 (2d Cir. 2015) .......... 45

*Sherman v. Town of Chester*,
752 F.3d 554 (2d Cir. 2014) .......... 34

*Thompson v. County of Franklin*,
15 F.3d 245 (2d Cir. 1994) .......... 5

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) .......... 16

*United States v. Decastro*,
682 F.3d 160 (2d Cir. 2012) .......... 17, 18

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 2, 12, 16, 17

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 17, 18

*Village of Euclid v. Ambler Realty Co.*,
272 U.S. 365 (1926) .......... 34, 43

*W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*,
31 F. App'x 19 (2d Cir. 2002) .......... *passim*

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) .......... 17

*Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*,
473 U.S. 172 (1985)....................................................................30, 32

*Yee v. City of Escondido*,
224 Cal. App. 3d 1349 (Ct. App. 1990)..........................................................22

*Yee v. City of Escondido*,
503 U.S. 519 (1992)....................................................................*passim*

**Statutes**

Cal. Civ. Code § 798.56....................................................................22

Civil Rights Act of 1964....................................................................21

N.Y.C. Admin. Code § 26-501....................................................................7

N.Y.C. Admin. Code § 26-502....................................................................7

N.Y.C. Admin. Code § 26-510....................................................................7, 8

N.Y.C. Admin. Code § 26-511....................................................................8

N.Y. Gen. Bus. Law § 352-eeee....................................................................22, 31

N.Y. Real Prop. Law § 238-a....................................................................8

N.Y. Unconsol. Law § 8584....................................................................31

N.Y. Unconsol. Law § 8622....................................................................45

N.Y. Unconsol. Law § 8623....................................................................47

N.Y. Unconsol. Law § 8624....................................................................7, 8

N.Y. Unconsol. Law § 8626....................................................................8, 31

N.Y. Unconsol. Law § 8630....................................................................8, 21

**Regulations**

9 NYCRR § 2504.2....................................................................8, 21, 28

9 NYCRR § 2504.4....................................................................*passim*

9 NYCRR § 2520.11 ........................................................................................50

9 NYCRR § 2522.4 ..........................................................................................50

9 NYCRR § 2524.5 ....................................................................................21, 50

**Other Authorities**

DHCR Office Rent Admin., *2019 Annual Report* (2019) .......................................11

DHCR Office Rent Admin., *Fact Sheet #8: Emergency Tenant Protection Act (ETPA) of 1974 Chapter 576 Laws of 1974 as Last Amended* (rev. Sept. 2019)..............................................................................7

Elyzabeth Gaumer, N.Y.C. Dep't of Hous. Pres. & Dev., *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey* (2018) ..........................................................................................11

Hr'g on S. 6458 (June 14, 2019), N.Y. State Assembly, Regular Sess. (Statement of Assembly Member Carmen De La Rosa) ....................................10

Hr'g on S. 6458 (June 14, 2019), N.Y. State Assembly, Regular Sess. (Statement of Assembly Member Jeffrey Dinowitz).........................................10

Hr'g on S. 6458 (June 14, 2019), N.Y. State Assembly, Regular Sess. (Statement of Assembly Member Steven Cymbrowitz)....................................46

Hr'g on S. 6458 (June 14, 2019), N.Y. State Assembly, Regular Sess. (Statement of Assembly Member Yuh-Line Niou) ..........................................46

N.Y. Bill Jacket, 2003 S.B. 5693, Ch. 82 ..............................................................50

N.Y. State Assembly, Bill No. A08281, Chamber Transcript................................51

N.Y. State Assembly Standing Comm. Hous., Public Hearing: Rent-Regulated Housing (May 2, 2019)...............................................................11, 48

N.Y. State Senate, Bill No. S2845A, Sponsor Mem. .............................................51

Rent Regulation for Housing in the New York City Defense-Rental Area, 8 Fed. Reg. 13914 (Oct. 12, 1943)..........................................................6

Sponsor's Mem., Bill Jacket, L. 2019, ch. 36...................................................10, 50

U.S. Census Bureau, Selected Housing Characteristics Table DP04,
American Community Survey 2018 ........................................................ 11

## PRELIMINARY STATEMENT

New York's carefully constructed, interlocking statutory and regulatory rent-stabilization framework (collectively, the "Rent Stabilization Laws" or "RSL") is the fruit of a century of practical experience and fifty years of legislative development and refinement. The RSL, which applies only where municipalities experiencing a housing emergency opt into its protections, currently regulates approximately one million apartments statewide, including nearly half the rental stock in New York City (the "City") alone. In 2019, the State Legislature enacted a package of amendments to the RSL and other housing laws (the "HSTPA" or "2019 Amendments"). As the District Court correctly held, the 2019 Amendments "build[] upon a long-standing regime of rent-stabilization that has repeatedly been upheld by courts." JA-211.[1] The 2019 Amendments restored some of the key rules in effect before 1993. Then, as now, the RSL did not allow landlords to deregulate individual apartments based on the rent level of a unit or the income of its tenants. These deregulatory loopholes incentivized landlords to find ways to push rent-stabilized tenants out of their homes.

Plaintiffs-Appellants ("Appellants")—three industry groups and six corporate landlords of partially or fully rent-stabilized buildings in Westchester County—ask

---

[1] Citations to "JA-__" refer to the Joint Appendix filed as ECF No. 60 (Jan. 13, 2022). Citations to "Br." refer to Plaintiffs-Appellants' Brief, filed as ECF No. 61 (Jan. 13, 2022).

this Court to turn the clock back. They seek a declaration that the 2019 Amendments on their face and as applied violate the Takings, Due Process, and Contract Clauses; an injunction prohibiting enforcement of the 2019 Amendments and attendant regulations on any building statewide; and damages. The District Court correctly dismissed their claims, aligning with two other District Courts.[2]

*First*, Appellants contend that their facial taking claims can succeed upon a showing that the 2019 Amendments lack a plainly legitimate sweep. But a facial "challenger must establish that no set of circumstances exists under which the [challenged law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). This Court has repeatedly dismissed facial claims against the RSL for failing to meet this high bar. *Rent Stabilization Ass'n of the City of N.Y. v. Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993); *W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002).

*Second*, Appellants claim that the 2019 Amendments effect a physical taking on their face and as applied. The District Court correctly disagreed. Because only compelled physical occupation effects a physical taking, and because landlords voluntarily rent out their units, the law does not effect a physical taking. *See Yee v. City*

---

[2] *See generally 335-7 LLC v. City of New York*, 524 F. Supp. 3d 316 (S.D.N.Y. 2021); *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33 (E.D.N.Y. 2020).

*of Escondido*, 503 U.S. 519, 527–29 (1992). This Court has thus rejected physical taking claims against the RSL at least four times. *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal* ("*FHL*"), 83 F.3d 45, 47–48 (2d Cir. 1996); *Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011); *W. 95 Hous.*, 31 F. App'x at 21; *Greystone Hotel Co. v. City of New York*, 1999 U.S. App. LEXIS 14960, at *3–4 (2d Cir. June 23, 1999) (summary order). The 2019 Amendments do not change the fact that landlords voluntarily rent their units and retain options for ending unwanted tenancies or converting their properties to non-rental use.

*Third*, Appellants claim that the 2019 Amendments effect a regulatory taking on their face and as applied. To succeed, they must show that the 2019 Amendments (1) have a substantial economic impact on regulated buildings, (2) interfere with the distinct and reasonable investment-backed expectations of regulated owners, and (3) have the character of a taking. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Because this "essentially ad hoc" standard must be applied property-by-property, *id.* at 124, 130–31; *accord Dinkins*, 5 F.3d at 596, it is not susceptible to facial analysis. *See W. 95 Hous.*, 31 F. App'x at 21.

As the District Court correctly held, Appellants' as-applied regulatory takings claims are not ripe because Appellants have not sought hardship exemptions or any conversions to non-rental use. In any event, Appellants fail to adequately allege that they prevail on any of the *Penn Central* factors on an as-applied or facial basis.

Given the inherent variation among regulated buildings, Appellants cannot allege sufficient economic impact on all properties. As applied, their individual allegations of diminished profitability are insufficient. Nor can Appellants allege interference with reasonable investment-backed expectations because many owners purchased long-regulated buildings and "[t]hose who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227 (1986) (quotation marks omitted). The 2019 Amendments also maintained the RSL's character as a land-use regulation—not a taking—as this Court has repeatedly concluded. *See FHL*, 83 F.3d at 48; *W. 95 Hous.*, 31 F. App'x at 21. The law's benefits and burdens are widely shared. That Appellants must bear some of those burdens "to secure the advantage of living and doing business in a civilized community" does not change this fact. *Sadowsky v. City of New York*, 732 F.2d 312, 319 (2d Cir. 1984) (quotation marks omitted).

*Fourth*, Appellants incorrectly claim that the 2019 Amendments violate substantive due process. They effectively concede that the 2019 Amendments are rationally related to numerous legitimate state interests, such as protecting consumer welfare, reducing the costs of dislocation, and preserving neighborhood stability. Appellants' effort to challenge the efficacy of the 2019 Amendments in achieving other goals has no place in rational-basis review.

*Finally*, Appellants' contention that the 2019 Amendments violate the Contract Clause fails because Appellants' claims are not based on existing contracts but rather speculative future ones. In any event, Appellants' claims would fail for the independent reasons that Appellants chose to participate in a heavily regulated residential rental market and the 2019 Amendments serve the legitimate and significant government interests of preventing rent shocks and keeping tenants in their homes.

For these reasons, Appellants' claims were properly dismissed.[3]

## STATEMENT OF THE ISSUES

1. Whether the District Court applied the correct standard of review to Appellants' motion to dismiss.

2. Whether the District Court applied the correct legal standard to Appellants' facial challenge.

3. Whether the District Court correctly held that the Complaint fails to state facial or as-applied claims for physical takings.

4. Whether the District Court correctly held that the Complaint fails to state facial or as-applied claims for regulatory takings.

[3] The District Court also correctly dismissed the claims asserted by Appellant DeRosa, who is a principal of Appellant Stepping Stones Associates, L.P. for an independent reason. JA-173–74. Appellants do not articulate any injury DeRosa suffered, nor do they assert how DeRosa has standing to assert constitutional claims for a building she does not own. Appellants have not carried their burden to establish DeRosa's standing. *See Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (noting that the party seeking standing has the burden to establish standing).

5. Whether the District Court correctly held that the Complaint fails to state a claim for violation of substantive due process.

6. Whether the District Court correctly held that the Complaint fails to state claims for violation of the Contract Clause.

## STATEMENT OF THE CASE

### A. New York's Rent Stabilization Laws

New Yorkers have long benefited from federal, state, and local regulation of rents and evictions. More than a century ago, the State enacted temporary tenant protections in the City and surrounding counties in response to a potentially "calamitous" housing emergency wherein "landlords took advantage of the situation to exact, under threats of eviction, whatever exorbitant rents the necessities of the occasion would bring forth." *People ex rel. Durham Realty Corp. v. La Fetra*, 230 N.Y. 429, 438 (1921). During World War II, the federal government regulated rents in the metropolitan area.[4] Because the "severe housing shortage" continued beyond the war, the State "enacted laws providing for rent control and, later, rent stabilization." *Rent Stabilization Ass'n of N.Y.C., Inc. v. Higgins*, 83 N.Y.2d 156, 164–65 (1993).

---

[4] *See* Rent Regulation for Housing in the New York City Defense-Rental Area, 8 Fed. Reg. 13914 (Oct. 12, 1943).

The City enacted the first RSL in 1969. *La Guardia v. Cavanaugh*, 53 N.Y.2d 67, 72 (1981). The State intervened in 1971 with a short-lived, unsuccessful experiment in deregulating apartments upon vacancy, and then expanded the RSL in 1974 with the Emergency Tenant Protection Act (the "ETPA"). *Id.* at 73–74. The ETPA "is not a rent and eviction regulating law" but rather "an enabling act" permitting the expansion (in the City) and adoption (originally only in Westchester, Nassau, and Rockland Counties) of rent stabilization through the municipal declaration of a housing emergency "as to all or any class or classes of housing accommodations" with a vacancy rate below five percent. *Id.* at 74–75, 75 n.6 (quotation marks omitted). The City and at least thirty-nine other municipalities—including twenty-one municipalities in Westchester County, JA-39 ¶ 36—have done so.[5]

Since its enactment, the RSL has applied to buildings built before 1974 that contain six or more apartment units. JA-36–37 ¶ 34. The RSL establishes a nine-member rent guidelines board ("RGB") for the City and for each county containing a municipality that opts into rent stabilization. *See* JA-37 ¶ 34; N.Y.C. Admin. Code § 26-510(a) (City); N.Y. Unconsol. Law § 8624(a) (counties). Each RGB establishes annual guidelines for legal rent adjustments for regulated properties,

[5] *See* N.Y.C. Admin. Code §§ 26-501–02; DHCR Office Rent Admin., *Fact Sheet #8: Emergency Tenant Protection Act (ETPA) of 1974 Chapter 576 Laws of 1974 as Last Amended*, at 3 (rev. Sept. 2019), *available at* https://on.ny.gov/3jLddvl.

considering the economic condition of the housing market, overhead costs of renting, housing supply, cost of living, and any other available information. N.Y.C. Admin. Code § 26-510(b); N.Y. Unconsol. Law § 8624(b). Landlords may charge rents up to the RGB-set maximum, may raise rents due to improvements, may apply for hardship exemptions if they are unable to maintain a consistent average rental income or if their gross rental income does not exceed their annual operating expenses by at least five percent of the gross rent, and must grant tenants the opportunity to renew their leases absent certain circumstances. N.Y.C. Admin. Code § 26-511(c); N.Y. Unconsol. Law §§ 8626(d), 8630(a)–(b).

At no point has the RSL required landlords to rent vacant apartments or prohibited them from terminating a tenancy through statutorily permitted means. Landlords may perform background and credit checks on prospective tenants, N.Y. Real Prop. Law § 238-a(1)(b), and evict tenants for unsatisfactory behavior, 9 N.Y. Comp. Codes R. & Regs. ("NYCRR") § 2504.2. Without the approval of the Division of Housing and Community Renewal ("DHCR"), any landlord may withdraw units to demolish or gut renovate the building on the condition of paying relocation expenses, 9 NYCRR § 2504.4(f); *see also Peckham v. Calogero*, 54 A.D.3d 27, 32 (1st Dep't 2009), and a landlord who is a natural person may recover a single apartment for the personal use of the landlord or her immediate family with a showing of immediate and compelling necessity. N.Y. Unconsol. Law § 8630(a). Any landlord

may also decline to renew a lease to withdraw units from the rental market. 9 NYCRR § 2504.4(b). And DHCR may approve the removal or eviction of a tenant if the removal or eviction "is not inconsistent with the purposes of [the ETPA]." *Id.* § 2504.4(c).

Since the RSL's enactment, the State has continually and carefully adjusted the law to respond to changing conditions in local housing markets. *See generally La Guardia*, 53 N.Y.2d at 71–76. DHCR expanded the RSL's protections to tenants' successors in the 1980s. *Higgins*, 83 N.Y.2d at 165–66. In 1993, statutory mechanisms were introduced for deregulating units upon rent reaching a legislatively determined threshold if those units housed either high-income tenants or became vacant. *See* JA-38 ¶ 35; *Roberts v. Tishman Speyer Props., L.P.*, 13 N.Y.3d 270, 280–81 (2009). Over the ensuing decades, the State continued adjusting the permissible rent increases for improvements, the thresholds for deregulation of a rental unit, the bases for converting units to non-rental use, and the percentage of tenants who must agree to any conversion of a regulated building to condominium or cooperative ownership. The RSL's core pillars—limiting rent increases and the grounds for eviction or non-renewal—have remained in place.

The 2019 Amendments revised various provisions of the RSL, the rent-control laws, and other landlord-tenant laws. L. 2019, ch. 36.[6] The State Legislature found that "the serious public emergency which led to the enactment of the existing laws regulating residential rents and evictions continues to exist." *Id.* Part D § 1. The Legislature also found that the deregulatory mechanisms passed in the 1990s—including the 1993 addition of high-income and vacancy decontrol and the 1997 addition allowing rent increases upon vacancy—had incentivized widespread tenant displacement, led to program abuses and fraud, and contributed to rent inflation.[7]

As relevant here, the 2019 Amendments repealed the requirement that the Legislature vote to extend the RSL's enabling statute every three years, permitted municipalities statewide to adopt rent stabilization, repealed some bases for rent increases (including upon vacancy) and adjusted others, repealed the high-income and vacancy decontrol mechanisms introduced in 1993, and adjusted the requirements for converting units or buildings to non-rental use. The 2019 Amendments do not require landlords to offer vacant apartments for rent, prohibit them from evicting unsatisfactory tenants, or bar them from converting rental properties to other uses.

---

[6] *Available at* https://legislation.nysenate.gov/pdf/bills/2019/s6458.

[7] *See, e.g.*, Hr'g on S. 6458 (June 14, 2019), N.Y. State Assembly, Regular Sess., pp. 73–74 (Statement of Assembly Member Jeffrey Dinowitz), *available at* https://www2.assembly.state.ny.us/write/upload/transcripts/2019/6-14-19.html; *id.* at pp. 116–18 (Statement of Assembly Member Carmen De La Rosa).

The RSL protects approximately a million apartments statewide.[8] The City-wide vacancy rate has been well below five percent since at least 2011.[9] The 2018 rental vacancy rates in Nassau County, Rockland County, Westchester County, and New York State as a whole were also below five percent.[10] The median income for rent-stabilized households in the City in 2016 ($44,560) was only two-thirds the median income of households in private non-regulated units ($67,000).[11] As of 2017, eighty-six percent of the City's rent stabilized units housed low-, moderate-, or middle-income tenants, the vast majority of whom are low-income.[12]

### B. Proceedings Below

The Complaint was filed six months after the enactment of the 2019 Amendments and attacks them in their entirety as violative of the Takings, Due Process, and Contract Clauses on their face and as applied. *See* JA-109–15. The Complaint alleges that the 2019 Amendments compel the physical occupation of regulated

---

[8] *See* DHCR Office Rent Admin., *2019 Annual Report* 20 (2019), *available at* https://on.ny.gov/3rldA1I.

[9] Elyzabeth Gaumer, N.Y.C. Dep't of Hous. Pres. & Dev., *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey* 16 tbl. 7 (2018), *available at* https://bit.ly/3yeOrcU.

[10] U.S. Census Bureau, Selected Housing Characteristics Table DP04, American Community Survey 2018, *available at* https://bit.ly/3lUhaP5.

[11] Gaumer, *supra* note 9, at 4.

[12] N.Y. State Assembly Standing Comm. Hous., *Public Hearing: Rent-Regulated Housing* 31:4–7 (May 2, 2019) (testimony of Elyzabeth Gaumer), *available at* https://bit.ly/3fdf5wk.

properties through mandatory lease renewal offers and eviction restrictions, impose on regulated landlords significant costs that interfere with their investment-backed expectations, unconstitutionally interfere with property rights by purportedly exacerbating the issues they seek to resolve and allegedly not being rationally related to any legitimate government interest, and unconstitutionally interfere with existing leases. *Id*. As remedies, the Complaint seeks the nullification of the 2019 Amendments, as well as compensation for the alleged takings of Appellants' properties. JA-115–16.

In a well-reasoned, ninety-one-page opinion, the District Court granted Appellees' motions to dismiss the Complaint in its entirety, JA-235, and Appellants appealed, JA-237–38.[13]

## SUMMARY OF THE ARGUMENT

The District Court applied the correct legal standards and properly dismissed the Complaint. Its judgment should be affirmed.

To prevail on their facial claims, Appellants "must establish that no set of circumstances exists under which the [2019 Amendments] would be valid." *Salerno*, 481 U.S. at 745. This Court has rejected facial taking claims against the RSL

[13] This appeal is the latest of five recent appeals to this Court following dismissal of constitutional challenges to the RSL or 2019 Amendments. *See Cmty. Hous. Improvement Program v. City of New York*, No. 20-3366; *74 Pinehurst LLC v. State of New York*, No. 21-467; *335-7 LLC v. City of New York*, No. 21-823; *G-Max Mgmt., Inc. v. State of New York*, No. 21-2448.

for failing to meet this high bar. *E.g.*, *Dinkins*, 5 F.3d at 595; *W. 95 Hous.*, 31 F. App'x at 21. Appellants' effort (at 14) to invoke a more lenient standard that would invalidate a statute lacking a "plainly legitimate sweep" is foreclosed by binding precedent and, in any event, applies only to First Amendment claims.

Appellants' physical-taking claims fail because the RSL—both before and after the 2019 Amendments—does not compel the physical occupation of any regulated property. *See Yee*, 503 U.S. at 528. Appellants do not dispute that they, along with all regulated owners, invited tenants to occupy their properties, and Appellants cannot show that the 2019 Amendments destroy any owner's bundle of property rights. Even during a tenancy, owners have the right to possess and dispose of their properties, as well as to use them for their core purpose: as rentals. Many rent-stabilized tenants end their tenancies voluntarily, and the 2019 Amendments preserve numerous avenues for owners to stop renting their properties if they wish to do so. *See Harmon*, 412 F. App'x at 422.

Appellants' as-applied regulatory-taking claims are unripe because Appellants have not applied for hardship exemptions from rent limits. The facial and as-applied claims also fail on the merits because Appellants do not adequately allege any of the three *Penn Central* factors: substantial economic impact, interference with distinct and reasonable investment-backed expectations, and character of the government action. *First*, Appellants' vague allegations of average economic harms

cannot save their claims. *Second*, because investment-backed expectations are made at the time of purchase, the choice of countless owners, including Appellants, to purchase regulated buildings precludes a favorable showing on this factor. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1949 (2017); *Connolly*, 475 U.S. at 227. *Third*, this Court has repeatedly held that the RSL has the character of a land-use restriction, *W. 95 Hous.*, 31 F. App'x at 21; *FHL*, 83 F.3d at 48; *Dinkins*, 5 F.3d at 594–95, and the District Court correctly found that the 2019 Amendments did not transform this character. Appellants also fail to adequately allege either that the 2019 Amendments deprive them of all economically beneficial use of their properties or compel the dedication of easements as a permitting condition.

The District Court properly dismissed Appellants' due process claim. The 2019 Amendments easily satisfy rational-basis review because they serve numerous legitimate interests, such as reducing dislocation costs, protecting consumer welfare, and preserving neighborhood stability. Appellants' effort to second-guess the law's efficacy in achieving other goals is mistaken.

Finally, the District Court correctly dismissed Appellants' Contract Clause claims because Appellants fail to allege that the 2019 Amendments substantially impair any existing contracts, and the 2019 Amendments are justified by a significant and legitimate public purpose. *CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 267 (2d Cir. 2009). Appellants' claims are based on the 2019

Amendments' effects on future leases, not existing leases. Regardless, there is no substantial impairment because the New York rental marked has been heavily regulated for decades, so landlords "cannot claim surprise that [their] relationships with certain tenants are affected by governmental action." *Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 403 (2d Cir. 1992). Moreover, the 2019 Amendments serve numerous significant government interests, including preventing displacement by rent shocks and protecting neighborhood stability.

This Court should affirm the judgment below.

## ARGUMENT

### I. The District Court Applied the Correct Standard of Review to the Motion to Dismiss

Although Appellants concede (at 14–15) that the District Court correctly stated the standard of review applicable to the motions to dismiss, *see* JA-156–58, Appellants contend (at 15–16) that the District Court in effect applied the standard for summary judgment by prematurely resolving factual disputes. But Appellants do not offer any examples of factual disputes that the District Court purportedly resolved. Instead, Appellants make only the conclusory argument (at 16) that, "[i]f the claims are taken as true the Order should be reversed and the matter remanded." This merely amounts to a disagreement about whether the allegations in the Complaint state claims for relief. As detailed below, they do not.

None of the cases cited by Appellants (at 15–16) helps them. Most of the cited cases resulted in dismissal. *See Eberhart v. Crozier*, 423 F. App'x 57, 58 (2d Cir. 2011); *In re AIG Advisor Grp. Sec. Litig.*, 309 F. App'x 495, 498 (2d Cir. 2009); *AFSCME Loc. 818 Waterbury City Emps. Ass'n v. City of Waterbury*, 198 F. App'x 47, 48 (2d Cir. 2006); *Gonzalez v. Option One Mortg. Corp.*, 2014 WL 2475893, at *11 (D. Conn. June 3, 2014). Although *Todd v. Exxon Corporation*, 275 F.3d 191, 201 (2d Cir. 2001) reversed the dismissal of a complaint, the case is inapposite because it concerned the specifics of antitrust law, *see id.*, and Appellants do not even attempt to explain why its outcome should control here. It does not.

## II. Appellants Misstate the Applicable Standard for a Facial Challenge

Appellants mistakenly argue (at 14) that their facial claims may succeed by showing the 2019 Amendments lack a "plainly legitimate sweep." "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). "Facial challenges are generally disfavored" because they often rest on speculation and risk short-circuiting the democratic process. *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010). To succeed, "the challenger must establish that *no set of circumstances* exists under which the [challenged law] would be valid." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (quoting *Salerno*, 481 U.S. at 745); *accord Kittay v. Giuliani*, 252 F.3d 645, 647 (2d Cir. 2001); *Dinkins*,

5 F.3d at 595, 597. The District Court thus correctly held that, to prevail, Appellants "must establish that no set of circumstances exists under which the [2019 Amendments] would be valid." JA-180 (quoting *Salerno*, 481 U.S. at 745).

Appellants' contrary arguments are unavailing. They rely (at 14) on *United States v. Stevens*, 559 U.S. 460 (2010), and *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), for their proposed "plainly legitimate sweep" standard.[14] But *Stevens* applied a standard unique to First Amendment claims,[15] and the Supreme Court

---

[14] A First Amendment overbreadth claim may succeed based on a showing that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

[15] For similar reasons, Appellants' reliance (at 14, 16–17) on *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352 (S.D.N.Y. 2015), *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012), and *Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016), is misplaced. In *Congregation Rabbinical*, the district court found plaintiffs' claims for religious discrimination fell under "exceptions to the *Salerno* standard." 138 F. Supp. 3d at 404. But the district court's prior ruling made clear that "the *Salerno* standard remains the basis for evaluating most facial constitutional challenges" outside the First Amendment. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 613 n.18 (S.D.N.Y. 2013). *Doe* and *Bruni* were likewise First Amendment cases. *Doe* involved circumstances unique to that context, including the government defendant's attempt to obviate the requirement for the government to establish a justification for the law at issue, that the law was narrowly tailored to achieve that justified end, and that there were alternative channels for receiving the speech blocked by the law. *See Doe*, 667 F.3d at 1115, 1131–35. *Bruni* applied "the analytical framework governing free speech claims." 824 F.3d at 363. These cases are inapplicable here.

expressly noted that it "need not and [did] not address" the facial standard that applies in "a typical case." 559 U.S. at 472. *Stevens* has no bearing on this case.[16]

*Decastro*, by contrast, supports applying the "no set of circumstances" standard here—not Appellants' proposed weaker standard. There, a criminal defendant challenged a restriction on transporting firearms as facially invalid. 682 F.3d at 163. Although this Court noted the "plainly legitimate sweep" standard in passing, *id.* at 168, it held that "[a] defendant who fails to demonstrate that a challenged law is unconstitutional as applied to him has necessarily failed to state a facial challenge, which requires him to establish that no set of circumstances exists under which the statute would be valid," *id.* at 163 (cleaned up). That test applies here.

Nor does *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), help Appellants. Appellants cherry-pick (at 14) *Patel*'s statement that the "proper focus" of a facial claim "is the group for whom the law is a restriction, not the group for whom the law is irrelevant." 576 U.S. at 418. But this was merely an illustration (in the warrantless-search context) of the general rule that a plaintiff asserting a facial claim must show the challenged law is "unconstitutional in all of its applications," meaning those "applications of the statute in which it actually authorizes or prohibits

---

[16] In any event, Appellants' claims would fail even the relaxed "plainly legitimate sweep" standard. As detailed in Parts III–V below, the Complaint does not adequately allege that any—much less a substantial number—of the RSL's applications are unconstitutional, as *Stevens* requires.

conduct." *Id.* Because the 2019 Amendments authorize and prohibit the conduct of all regulated building owners, Appellants' facial claims must fail unless they establish no set of circumstances under which the 2019 Amendments can apply constitutionally.

## III. The 2019 Amendments Do Not Effect Physical Takings of Any Appellants' Properties

The District Court correctly dismissed Appellants' physical-taking claims. JA-181 n.14, 186. "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee*, 503 U.S. at 527. The RSL, both before and after the 2019 Amendments, does not compel any owner to offer its property for rent. To the contrary, all owners invite tenant occupation, and the 2019 Amendments preserve numerous avenues for any owner to end a tenancy or remove its building from the rental market.

### A. Appellants Do Not Plausibly Allege a Facial Physical Taking

As the District Court properly held, "courts have repeatedly recognized that when owners invite tenants to physically occupy their apartments, laws like the [2019 Amendments] (and the RSL before [them]) simply govern the property owners' voluntary use of their property as rental housing." JA-182–83 (citing, *inter alia*, *FHL*, 83 F.3d at 47–48). That principle requires dismissal of Appellants' facial claim.

#### 1. The 2019 Amendments Do Not Compel Physical Occupation, and They Preserve Lawful Means to End a Tenancy or Remove a Property from the Rental Market

The District Court correctly found "no physical taking because the [2019 Amendments do] not compel physical occupation." JA-183. Where "a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking." *FHL*, 83 F.3d at 47–48.

Even after the 2019 Amendments,[17] Appellants may still freely possess and dispose of their properties and continue to use them for the very purpose for which Appellants bought them: to rent out to tenants. By complaining (at 17–18) that the RSL's protections make the "investment … no longer profitable" and "limit an owner's increased income options," Appellants effectively concede that they do not object to the physical presence of tenants. Rather, they object to the financial terms of tenancies. Appellants might prefer different, richer tenants, but the Takings Clause does not prohibit the government from requiring a landlord "to accept tenants he does not like." *Yee*, 503 U.S. at 529 (citing *Heart of Atlanta Motel, Inc. v. United*

[17] Appellants also attack RSL protections that long predate the 2019 Amendments. For example, Appellants take issue with (at 21, 24) their obligation to offer renewal leases and (at 19, 24, 27) the right of certain live-in family members (not mere "roommates," as Appellants repeatedly call them) to succeed the original tenant on the lease. As the District Court correctly concluded, these "longstanding and pre-existing provisions … predated [the 2019 Amendments'] enactment" and have been "repeatedly upheld by courts." JA-188.

*States*, 379 U.S. 241, 261 (1964) (rejecting taking challenge to public accommodations provision of the Civil Rights Act of 1964)); *see also Higgins*, 83 N.Y.2d at 172 ("It is the forced occupation, not the identities of the new tenants or the terms of the leases, which deprives the owners of their possessory interests and results in physical takings." (alterations and citations omitted)).

Appellants claim (at 17–23) that the 2019 Amendments effectively "foreclose[d]" all means to exit the rental market and thereby authorized perpetual tenancies. Not so. The 2019 Amendments preserve lawful means for any owner to end or decline to renew a tenancy, or to convert its property to non-rental use. Owners may, among other things:

1. sell their properties to others;
2. elect not to offer regulated units for rent upon vacancy;
3. evict a tenant who fails to pay rent, violates the lease agreement, commits a nuisance, or uses the apartment for unlawful purposes, 9 NYCRR § 2504.2;
4. decline to renew a lease if the tenant does not occupy the unit as a primary residence, *id.* § 2504.4(d);
5. decline to renew a lease for the purpose of repossessing one unit for personal use if the owner or an immediate family member has an immediate and compelling need to occupy it as a primary residence, N.Y. Unconsol. Law § 8630(a);
6. withdraw a unit from the housing and non-housing rental markets, without any intent to rent or sell all or any part of the property, with DHCR approval, 9 NYCRR § 2504.4(b);

7. demolish or gut renovate a building (with payment of relocation expenses), *id.* § 2504.4(f); *Peckham*, 54 A.D.3d at 32;

8. convert regulated apartments to condos or co-ops with purchase agreements from at least fifty-one percent of existing tenants in the building, 2019 Amendments Part N (amending N.Y. Gen. Bus. Law § 352-eeee); and

9. remove or evict a tenant with DHCR approval if removal or eviction of the tenant is not inconsistent with the purposes of the ETPA, 9 NYCRR § 2504.4(c).

Appellants contend (at 18, 20–21) that these options are "virtually impossible" or used "extremely rare[ly]" in practice, such that owners "cannot actually exit the residential rental market." But *Yee* squarely rejected this argument, holding that purported practical difficulties in converting a particular property to non-rental use has no bearing on a facial taking claim. 503 U.S. at 528.[18] The same reasoning applies here, and *Yee* forecloses Appellants' claim. *See Conn. Ass'n of Health Care Facilities, Inc. v. Bremby*, 519 F. App'x 44, 45–46 (2d Cir. 2013) (rejecting as

[18] The law challenged in *Yee* prohibited landlords from terminating or refusing to renew tenancies except on statutorily permissible grounds, including change of use. *See* Cal. Civ. Code § 798.56 (1990); *Yee v. City of Escondido*, 224 Cal. App. 3d 1349, 1352 (Ct. App. 1990). The landlords argued that such "conversion present[ed] a kind of gauntlet" by requiring owners to give sufficient notice to tenants, prepare a report on the impact of conversion, and obtain any necessary "discretionary approvals." Reply Br. Pet'rs 10 n.16, 1992 WL 545134 (Jan. 14, 1992). Because the landlords "d[id] not claim to have run that gauntlet," *Yee* "provide[d] no occasion to consider how the procedure ha[d] been applied to [their] property," and the Supreme Court "accordingly confine[d] [itself] to the face of the statute." *Yee*, 503 U.S. at 528.

foreclosed by *Yee* a nursing home's claim that state law made it practically impossible to discharge Medicaid patients).

Indeed, this Court and the New York Court of Appeals have relied on the availability of such exit options to reject physical taking challenges to the RSL. *Harmon*, for example, held that the RSL did not compel permanent physical occupation because landlords "retain[ed] statutory rights" to, among other things, (1) recover possession based on immediate and compelling necessity for personal use, (2) demolish the building to change the use of the property, or (3) evict an unsatisfactory tenant. 412 F. App'x at 422; *accord Higgins*, 83 N.Y.2d at 171–72 (rejecting argument that the RSL "created perpetual tenancies" because owners can "evict an unsatisfactory tenant or convert rent-regulated property to other uses").

Appellants' contention (at 18) that the 2019 Amendments are the "'equivalent' of … physical encroachment" and "therefore governed by the reasoning in" *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), is incorrect. The challenged law in *Loretto* on its face compelled a physical occupation by precluding a landlord from "interfer[ing] with the installation of cable television facilities upon his property or premises." *Id.* at 423. The Supreme Court made clear its ruling reflected a "very narrow" application of the "traditional rule" for a physical taking that "involved a direct physical attachment" on private property by government order. *Id.* at 438, 441.

As this Court has repeatedly held, the RSL bears no resemblance to the challenged law in *Loretto* because the RSL merely "regulates the terms under which the owner may use the property as previously planned." *FHL*, 83 F.3d at 48; *accord Harmon*, 412 F. App'x at 422; *see also W. 95 Hous.*, 31 F. App'x at 21 (holding that "the RSL regulates land use rather than effecting a physical occupation"); *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 87 N.Y.2d 325, 335 (1995) (holding that because "no new use of the property [was] … forced upon plaintiff" by the RSL, "no unconstitutional physical taking ha[d] been effectuated"); *Higgins*, 83 N.Y.2d at 172–73 (same).

*Yee* and *Loretto* confirm that, once a landlord invites tenant occupation, the government has "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Yee*, 503 U.S. at 528–29 (quoting *Loretto*, 458 U.S. at 440); *accord FHL*, 83 F.3d at 47–48 ("[W]here a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking."). Accordingly, this

Court has repeatedly upheld the constitutionality of the RSL. *FHL*, 83 F.3d at 47–48; *Harmon*, 412 F. App'x at 422; *W. 95 Hous.*, 31 F. App'x at 21.[19]

Plaintiffs misplace their reliance on *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) to assert (at 26–28) that the 2019 Amendments "grant a right to invade" and "bind owners [to rent] in perpetuity." In *Cedar Point*, the government granted uninvited labor organizers a "right to take access" to private farms for three hours per day, 120 days per year. 141 S. Ct. at 2069. The 2019 Amendments do not grant tenants—who were invited by landlords—any comparable invasion right. Moreover, *Cedar Point* recognized that "[l]imitations on how a business generally open to the public may treat individuals on the premises," including limitations on the right to exclude those individuals, "are readily distinguishable from regulations granting a right to invade property closed to the public." *Id.* at 2077. "Because they voluntarily open their propert[ies] to occupation by others," Appellants "cannot assert a *per se* right to compensation based on their inability to exclude particular

---

[19] Appellants cite (at 23–24) *Seawall Associates v. City of New York*, 74 N.Y.2d 92 (1989), to argue that the RSL's exit options, like the *Seawall* law's "buy-out, replacement, and hardship exemptions," do not save the RSL from being a physical and regulatory taking. But the challenged law in *Seawall* required owners to renovate and rent vacant apartment units, and the New York Court of Appeals expressly distinguished cases like this one where owners "voluntarily put their properties to use for residential housing." *Id.* at 105. This Court has twice cited *Seawall* to *reject* taking claims against the RSL. *See FHL*, 83 F.3d at 48; *Greystone Hotel*, 1999 U.S. App. LEXIS 14960, at *3–4.

individuals." *Yee*, 503 U.S. at 531 (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82–84 (1980)). Thus, whether the 2019 Amendments overly restrict landlords' ability to end tenancies or convert their properties to non-rental use are factual inquiries to be assessed under the *Penn Central* standard, not the *per se* test. *Yee*, 503 U.S. at 527–31.[20]

Appellants advance a hodgepodge of other arguments that misstate the law and have no bearing on the physical takings analysis. Their assertion (at 20) that the 2019 Amendments are not "tied to the[ir] stated purpose" (described by Appellants (at 49) as "affordable housing") invokes the standard that courts use in evaluating due process claims, not alleged takings. Similarly, Appellants' repeated complaint (at 17–20, 23, 25–26) that the 2019 Amendments interfere with owners' "investment backed expectations" is relevant to a regulatory takings analysis, not a physical takings analysis. *See infra* Part IV. Appellants' reliance (at 30) on *Harris v. Israel*, 191 A.D.3d 468 (1st Dep't 2021) for its discussion of "settled expectations" ignores that the court was assessing retroactivity under the Due Process Clause. *See Harris*,

---

[20] Appellants misconstrue (at 28) the Supreme Court's passing reference to *Cedar Point* in *Pakdel v. City and County of San Francisco*, 141 S. Ct. 2226 (2021). *Pakdel* did not reach the merits of petitioners' regulatory takings claims but vacated the judgment and remanded the case to the Ninth Circuit upon holding that such claims were ripe. 141 S. Ct. at 2231. In a footnote, *Pakdel* merely observed that the "Ninth Circuit may give further consideration to these claims in light of [the Supreme Court's] recent decision in *Cedar Point*"—a 2021 decision that had not been handed down when the Ninth Circuit issued its opinion in 2020. *Id.* at 2229 n.1.

191 A.D.3d at 470. And Appellants' discussions (at 19–20, 24–26) of *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234 (1978) and *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362 (2d Cir. 2006) describe the analysis for a claim brought under the Contract Clause, not the Takings Clause. None of these arguments save Appellants' physical takings claims, and they all fail for the reasons discussed *infra* Parts IV–VI.

#### 2. Appellants' Attacks on the Available Exit Options Fall Flat

Appellants first argue (at 20) that the 2019 Amendments' changes to the requirements for converting rental buildings to condominium or cooperative ownership unduly restricted their ability to change the use of their properties by increasing the requisite tenant agreements from fifteen to fifty-one percent. But "whether a use restriction effects a taking" is determined by applying "the flexible test developed in *Penn Central*," not the *per se* test that applies when "the government has physically taken property for itself or someone else." *Cedar Point*, 141 S. Ct. at 2072. The District Court thus correctly observed that, "while the [2019 Amendments] may have added certain hurdles to the conversion of rental properties, the [2019 Amendments] do[] not on [their] face require [Appellants] to rent their properties; that was a choice of their own making." JA-184.

Appellants also complain (at 30) about the restrictions on owners' ability to repossess more than one unit for personal use, arguing that the "immediate and

compelling necessity" requirement "has no standards." Because the owner-occupancy option has never been available to corporate landlords, *e.g.*, *Fanelli v. N.Y.C. Conciliation & Appeals Bd.*, 90 A.D.2d 756, 756–57 (1st Dep't 1982), the 2019 revisions change nothing for Appellants. In any event, *Harmon* already held that the personal-use option, even with a required showing of "immediate and compelling necessity," supported dismissal of a physical taking claim, 412 F. App'x at 422. Although the 2019 Amendments reduced the number of units an owner may reclaim for personal use, owners retain other options for ending tenancies in other units. *See supra* Part III.A.1.

Appellants' passing attacks (at 23) on the exit options through eviction and withdrawal due to hazardous conditions similarly fail. The RSL has long prevented landlords from evicting rent-stabilized tenants, as distinct from refusing to renew such tenants' leases, except for wrongful conduct by the tenant. *E.g.*, *Carriage House Realty Co. v. Conlon*, 487 N.Y.S.2d 971, 972 (Yonkers City Ct. 1985) (discussing 9 NYCRR § 2504.2). This scheme supported dismissal of physical taking claims against the RSL in *Harmon*, 412 F. App'x at 422, and *Higgins*, 83 N.Y.2d at 171–72. Appellants do not explain why a different outcome is warranted here. And although they reference withdrawing units because of a safety hazard, they ignore that landlords outside the City may withdraw a unit from the housing and non-housing rental markets, without any intent to rent or sell all or any part of the property,

with DHCR approval. *See* 9 NYCRR § 2504.4(b). Moreover, owners retain other exit options under law, as detailed above.

### B. Appellants Do Not Plausibly Allege Any As-Applied Physical Takings

Appellants do not identify any individualized allegations that might support an as-applied claims. Indeed, Appellants concede (at 16) that "the essence of the 'as applied' claim is the same as the 'facial' claim." Observing that the Complaint fails to include any analysis of the 2019 Amendments' application to Appellants, the District Court properly construed Appellants' takings challenge as only a facial one and dismissed it. JA-185 n.15.

In any event, none of the landlord Appellants contends that it attempted to exercise any of the available exit options or that it would stop offering apartments for rent if the 2019 Amendments were no longer in effect. As such, Appellants cannot establish that the 2019 Amendments compel the physical occupation of their units. *Yee*, 503 U.S. at 527–28; *see also Pennell v. City of San Jose*, 485 U.S. 1, 10 (1988) ("[W]e have found it particularly important in takings cases to adhere to our admonition that 'the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary.'" (quoting *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 294–95 (1981))).

## IV. The 2019 Amendments Do Not Effect a Regulatory Taking on Their Face or As Applied to Any Appellant's Property

The District Court properly dismissed Appellants' regulatory takings claims because the Complaint fails to carry "the heavy burden placed upon one alleging a regulatory taking." JA-214 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493 (1987)); *accord Buffalo Teachers*, 464 F.3d at 375.

### A. Appellants' Claims Are Not Ripe

The District Court correctly held that Appellants' as-applied regulatory taking "claims are not ripe for judicial review" because those Appellants seeking to stay in the rental market "do not allege that they sought and have been denied hardship exemptions" made available to them by the RSL, and those Appellants purportedly seeking to convert their properties to non-rental use have not tried "to obtain the requisite tenant agreements." JA-212–14.

"[A] plaintiff's failure to properly pursue administrative procedures may render a claim unripe if avenues still remain for the government to clarify or change its decision," including where the plaintiff has "an opportunity to seek a variance." *Pakdel*, 141 S. Ct. at 2231 (emphasis removed);[21] *accord Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186–90 (1985)

[21] In *Pakdel*, the Court held there was *de facto* finality because "the city had twice denied their requests for the exemption" and could no longer grant relief. 141 S. Ct. at 2229. Here, no Appellant has applied for a hardship, much less been denied relief.

(finding taking claim unripe where owner had not sought variance from challenged restriction), *overruled on other grounds by Knick v. Township of Scott*, 139 S. Ct. 2162, 2169–70 (2019) (abrogating separate "state-litigation requirement" for ripeness).

Appellants' as-applied regulatory taking claims are not ripe because they have not pursued procedures available to them to alleviate their alleged burdens. If Appellants' rental incomes exceed their expenses by a statutorily-defined percentage, they can qualify for hardship exemptions. N.Y. Unconsol. Law §§ 8626(d)(4), (5), 8584(4). If Appellants gain the assent of fifty-one percent of tenants, they may seek the Attorney General's approval to convert their buildings from rental use to condominium or cooperative ownership. N.Y. Gen. Bus. Law § 352-eeee. Because Appellants have not applied for any hardship exemptions or attempted to convert their properties to non-rental use, their claims are speculative and unripe for judicial review.

Appellants contend (at 32) that their claims are ripe because an "attempt to convert under the new law or to challenge any of the limits on increases is now futile." Appellants provide no support for their conclusory futility assertion, and as the District Court noted, Appellants "have not tried to take advantage of available hardship exemptions" or meet the requirements for conversion to condominium or cooperative ownership. JA-213–14. It is well established that the "fail[ure] to

submit a single variance application" leaves a property owner's claims unripe. *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 353 (2d Cir. 2005) (citing *Williamson Cnty.*, 473 U.S. at 190).[22] In any event, Appellants have not come close to alleging futility.

### B. The Complaint Fails to Establish Any *Penn Central* Factor on a Facial Basis or As Applied

Far from satisfying the "intensive *ad hoc* inquiry" required under Supreme Court precedent to establish a regulatory taking, *Buffalo Teachers*, 464 F.3d at 375, Appellants do not adequately allege any of the "familiar" *Penn Central* factors: (1) economic impact, (2) interference with distinct investment-backed expectations, and (3) character of a taking, *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 264 (2d Cir. 2014). The District Court correctly dismissed these claims. JA-200–214.

#### 1. The 2019 Amendments Do Not Have a Substantial Economic Impact on All Owners or Any Appellant

The District Court rightly concluded that Appellants fail to adequately allege sufficient economic impact. JA-202, 204–07.[23] The Complaint is bereft of

---

[22] Appellants' statement (at 47) that a facial challenge ripens at the time the challenged law is enacted does not cure their failure to ripen their as-applied claims.

[23] Appellants cite (at 33) *Petworth Holdings, LLC v. Bowser*, 308 F. Supp. 3d 347 (D.D.C. 2018), to suggest that they need not show significant economic impact at the pleading stage, as long as they make a strong showing on the other *Penn Central*

allegations (and Appellants' brief adduces none) that the 2019 Amendments have a substantial economic impact on every regulated property, as would be required to prevail on a facial claim. *E.g.*, *Dinkins*, 5 F.3d at 595. *Dinkins* held that a facial taking challenge to the RSL could not lie where the complaint alleged that, at most, "many" owners were "deprived of a constitutionally adequate return by the across-the-board limitations in the [RSL] placed on annual rent increases" and that some of those owners were "unable to remedy the [purportedly] confiscatory results of the [RSL's] basic provisions" through hardship exemptions. *Id.*[24]

The Complaint contains the same fatal defects. Appellants repeatedly rely on patently overbroad statements, generalized speculation, and mere anecdotes about provisions that on their face will affect different landlords differently. *See, e.g.*, JA-66 ¶ 79 (alleging effects on "median regulated rents in Manhattan"); *id.* ¶ 80 (alleging discrepancies between average rent increase and average expenses); JA-68 ¶ 82 (alleging "a range of values per square foot for various properties" in Manhattan); JA-97 ¶ 128 (alleging that the 2019 Amendments "reduced the market value of regulated properties, in some cases by over 50%").

---

factors. Even if *Petworth* had any bearing on the standard in this Circuit (it does not), all three *Penn Central* factors weigh in favor of dismissal here, as detailed in this section and *infra* Part IV.B.2–3.

[24] Appellants' suggestion (at 39) that *Dinkins* applied the standard for summary judgment is mistaken. *Dinkins* affirmed dismissal on the pleadings. 5 F.3d at 593.

Appellants do not allege any specific diminutions in the values of their properties. Even if they had, the Supreme Court has "long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (75% diminution in value); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5%)). Courts have thus rejected regulatory taking challenges to regulations that reduced property far more than the 2019 Amendments allegedly do here. *See, e.g.*, *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (81%); *Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 696 (4th Cir. 2018) (83%); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004) (92%).[25]

The Complaint also makes repeated conclusory allegations that the 2019 Amendments prevent "rent regulated landlords … from realizing a reasonable return on their investments." JA-62 ¶ 72; *see also* JA-65 ¶ 78 (alleging deprivation "of a

---

[25] This case is not like *Sherman v. Town of Chester*, 752 F.3d 554 (2d Cir. 2014), which Appellants cite (at 42). In *Sherman*, plaintiff was prevented, by iterative acts of "obstruction" by the Town that "singled out" his property, from developing that property. *Id.* at 565. No such singling out has occurred here, nor are Appellants prevented from using their properties as rentals, exactly as they intend. Moreover, as the District Court concluded, this case is unlike *Sherman* since there has been no action "prevent[ing] [Appellants] from making any economic use of [their] property." JA-205 n.29.

fair return on their investment"); JA-69 ¶ 83 (alleging prevention "from achieving the growth in rents that would be reasonably expected by any investor"); JA-96 ¶ 126(b) (alleging "limitations on property owners' ability to recover the reasonable expenses associated with maintaining apartment units"). Moreover, Appellants argue (at 34) that the 2019 Amendments prevent owners from "operat[ing] with some profit." But this Court has repeatedly "rejected the notion that loss of profit—much less loss of a reasonable return—alone could constitute a taking." *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139 (2d Cir. 1984). This is especially true where, as here, an owner "may still rent apartments and collect the regulated rents," even if it may "not profit as much as it would under a market-based system."[26] *FHL*, 83 F.3d at 48. In any event, the RSL's hardship exemptions from the rent limits (unchanged by the 2019 Amendments) are available to ensure landlords obtain reasonable returns. *See generally Dinkins*, 5 F.3d at 595.

Appellants' individual allegations of economic impact similarly fail because, as the District Court correctly found, they merely "assert that the rents they are able to charge are insufficient," JA-205; *see also* JA-27–33 ¶¶ 22–26, and Appellants have not asserted any claim against the Westchester RGB, which determines how

[26] *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083 (9th Cir. 2015), cited by Appellants (at 36), affirmed the dismissal of facial and as-applied regulatory-taking claims, *id.* at 1090–91. It thus supports affirmance here.

much Appellants may increase rents, JA-206 n.30. Moreover, Appellants do not allege the rental income for their buildings (as opposed to "[e]xamples" of some rents), costs, any specific diminutions in value, or that they can no longer find buyers for their buildings. *See Park Ave. Tower*, 746 F.2d at 139 (citing as a key inquiry in regulatory taking analysis "whether others might be interested in purchasing all or part of the land for permitted uses" (quotation marks omitted)); JA-27–34. Nor do Appellants allege that they have sought hardship exemptions to mitigate any economic harms. *See supra* Part IV.A. The Complaint is devoid of specific allegations showing the requisite economic impact on all regulated properties or even Appellants' properties.

**2. The 2019 Amendments Do Not Interfere with Investment-Backed Expectations of All Owners or Any Appellant**

The District Court correctly concluded that the Complaint does not adequately allege that the 2019 Amendments interfere with the reasonable investment-backed expectations of every landlord within its reach, or even any Appellant. JA-207–10. "The purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (quotation marks omitted). Accordingly, "the critical time for considering investment-backed expectations is the time a

property is acquired, not the time the challenged regulation is enacted." *Meriden Tr. & Safe Deposit Co. v. FDIC*, 62 F.3d 449, 454 (2d Cir. 1995).

The RSL was first enacted in 1969 and has ever since circumscribed landlords' ability to raise rents, decline to renew leases, and evict tenants. Throughout the ensuing five decades, the State Legislature tinkered with the RSL's bases for rent increases, non-renewal, and eviction—including by adding (in 1993) the now-repealed high-income and vacancy decontrol and (in 2003) preferential rent increases—but always maintained these core protections. Many chose to invest in heavily regulated rental markets by acquiring multi-unit residential buildings already subject to the RSL. These owners "acquired their property … with full knowledge that it was subject to the RSL." *Harmon*, 412 F. App'x at 422.

Appellants take issue (at 38) with the 2019 Amendments' elimination of mechanisms to deregulate rental units and their limitations on the amounts of permissible rent increases for improvements. But these allegations cannot cure the fact that numerous owners, Appellants included, chose to operate in a highly regulated field. "Those who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Connolly*, 475 U.S. at 227 (quotation marks omitted). As the New York Court of Appeals has "repeatedly made clear," "no party doing business in a regulated environment like the New York City rental market can expect the RSL to remain static."

*Regina Metro Co. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 369 (2020). This Court has likewise held that given the "heavily-regulated" nature of the City's rental market, a landlord "cannot claim surprise that [its] relationships with certain tenants are affected by government action." *Kraebel*, 959 F.2d at 403.

### 3. The 2019 Amendments Did Not Transform the RSL's Character from a Land-Use Regulation into a Taking

The District Court correctly followed this Court's precedents in finding that the 2019 Amendments maintain the RSL's character of a land-use regulation, not a taking. JA-210-12. Where, as here, a regulation does not compel "a physical invasion" but "instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good,'" the regulation does not have the character of a taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (quoting *Penn Cent.*, 438 U.S. at 124). Accordingly, this Court has repeatedly held that the RSL does not have the character of a taking because it regulates land use, rather than compelling physical occupation, and preserves on its face numerous means of ending tenancies. *E.g.*, *Harmon*, 412 F. App'x at 422; *FHL*, 83 F.3d at 48.

The 2019 Amendments did not transform the RSL's character. While Appellants contend (at 38) that the 2019 Amendments limited or eliminated certain bases for increasing rents and eliminated deregulatory mechanisms, "[l]egislative tinkering of this sort inevitably creates individual winners and losers, for one man's

defense is another man's obstacle." *1256 Hertel Ave.*, 761 F.3d at 265 (finding that statutory adjustment of homestead exemption from bankruptcy exposure did not have the character of a taking). Nothing in the RSL requires property owners to invite tenants in the first place, and the RSL still contains statutory options for landlords to end tenancies. Such a "land-use regulation" that is "coordinated" among multiple levels of government, *Murr*, 137 S. Ct. at 1949–50, and imposes only "negative restriction[s]," *Buffalo Teachers*, 464 F.3d at 375, is not characteristic of a taking.

Appellants argue (at 40) that the RSL, as revised by the 2019 Amendments, nonetheless has the character of a taking because it "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." To be sure, the question for a regulatory taking is what "in all fairness and justice, should be borne by the public as a whole." *Lingle*, 544 U.S. at 537. But as *Lingle* makes clear, this question does not answer whether a regulation goes "too far" and thereby effects a regulatory taking—*Penn Central* does.[27] *Lingle*, 544 U.S. at 538, 542–43.

---

[27] Appellants' contention (at 34) that the District Court "ignored the issue of 'going too far'" cannot be squared with the District Court's express, repeated consideration of this very issue. *See* JA-198 ("A regulatory taking occurs when the government acts in a regulatory capacity and such state regulation 'goes too far' and 'effects a taking.'" (quoting *Buffalo Teachers*, 464 F.3d at 374)); JA-202 ("As discussed

And under *Penn Central*, "it cannot be said that the Taking[s] Clause is violated whenever legislation requires one person to use his or her own assets for the benefit of another." *Connolly*, 475 U.S. at 223. "Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others." *Keystone*, 480 U.S. at 491. That is why the character analysis focuses not only on those who are burdened by a challenged use restriction but also on those who benefit directly or indirectly from it, such as employees invited into a mine subject to safety regulations, *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922), or the community surrounding a restricted property, *Keystone*, 480 U.S. at 491–92.

The RSL's burdens and benefits are widely shared. Both before and after the 2019 Amendments, the law has restricted landlords of approximately a million apartments across at least forty municipalities statewide, including those where Appellants' buildings are located, from imposing rent increases or ending tenancies except as permitted by law. Rent-stabilized tenants benefit from having stable, long-term housing and rents, and this stability undoubtedly has a positive ripple effect.

---

previously, a regulatory taking occurs when governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.'" (quoting *Lingle*, 544 U.S. at 537)); JA-203 ("Mere profit loss, however, does not establish that a regulation has gone too far.").

Employers benefit because their rent-stabilized employees are less likely to suffer the distraction and disruption of forced moves due to rent shocks or eviction. Local neighborhoods, schools, businesses, civic organizations, and religious institutions benefit when residents are secure enough to set down roots in the community. To the extent the 2019 Amendments result in higher rents for unregulated properties, those owners also benefit.

Appellants may complain (at 40–41) that their benefits from the 2019 Amendments do not approximate the costs they claim to bear, but "[t]he Takings Clause has never been read to require the States or the courts to calculate whether a specific individual has suffered burdens under this generic rule in excess of the benefits received." *Keystone*, 480 U.S. at 491 n.21.

### C. Appellants' Attempts to End-Run *Penn Central* Fail

This Court should reject Appellants' attempts to circumvent the *Penn Central* analysis. Appellants assert (at 44–45) that the 2019 Amendments effect both categorical, *per se* regulatory takings and land-use exactions. The District Court correctly rejected both theories. JA-204–05. A *per se* regulatory taking exists when the government completely deprives an owner of all economically beneficial uses of its property. *See Lingle*, 544 U.S. at 538 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). Appellants' alleged deprivation comes nowhere close to such a total deprivation. *See, e.g.*, JA-97–98 ¶ 128 (alleging that the 2019

Amendments have "reduced the market value of regulated properties, in some cases by over 50%"). A land-use exaction may be found when the "government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." *Lingle*, 544 U.S. at 546 (citing *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994)). No such condition exists here.

Appellants further argue (at 35–36) that the Constitution "mandate[s] … a reasonable return" to landlords and that the 2019 Amendments make such a return "impossible." But this Court has been clear that "the inability of [landlords] to receive a reasonable return on their investment by itself does not, as a matter of law, amount to an unconstitutional taking." *Park. Ave. Tower*, 746 F.2d at 138. Regardless, the RSL's hardship provisions allow for rent increases if a landlord cannot obtain an adequate return, and the Westchester RGB—against which Appellants elected not to assert claims, *see* JA-206 n.30—is not legislatively constrained from raising rents further than it has in the past.

Appellants also rely (at 41–42) on *Seawall*, 74 N.Y.2d at 92, to argue incorrectly that the District Court should have applied the "substantive due process inquiry" of whether the 2019 Amendments "substantially advance" legitimate governmental interests. *Lingle* expressly rejected an identical argument, holding "that this

formula prescribes an inquiry in the nature of a due process, not a takings, test, and that it has no proper place in our takings jurisprudence." 544 U.S. at 540.[28]

Finally, Appellants suggest (at 32) that the legislature did not "investigate[] and ma[ke] the appropriate findings to legitimize" the 2019 Amendments. That is factually inaccurate—the 2019 Amendments are supported by a substantial legislative record, *see infra* Part V—and legally irrelevant because "the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose," *Lingle*, 544 U.S. at 543.

## V. Appellants Do Not Allege a Violation of Substantive Due Process

As the District Court properly determined, Appellants' due process challenge is subject to rational-basis review. *See* JA-214–15. The 2019 Amendments easily clear this bar, and the District Court's dismissal should therefore be affirmed.

### A. Rational-Basis Review Governs Appellants' Due Process Claim

Appellants seemingly argue (at 52–53) that the District Court failed to apply a "strict scrutiny" or heightened standard, but they concede elsewhere (at 49, 51) that rational-basis review should apply. There is no doubt that rational-basis review applies. Since at least 1926, the Supreme Court has directed lower courts to apply rational-basis review to regulations that limit what property owners may do with their land. *See Village of Euclid*, 272 U.S. at 395; *accord Lingle*, 544 U.S. at 544–

---

[28] *Seawall* is also inapposite for the reasons discussed *supra* note 19.

45. The Supreme Court unanimously applied rational-basis review to the due process challenge to rent regulations in *Pennell*, 485 U.S. at 11–13; *id*. at 15 (Scalia, J., concurring), and it made clear in *Lingle*, which addressed a rent regulation regime, that it has "long eschewed … heightened scrutiny when addressing substantive due process challenges to government regulation," 544 U.S. at 545.[29] The District Court thus properly determined that rational-basis review applies to Appellants' due process claim. JA-214–15.

### B. The RSL Easily Passes Rational-Basis Review

The 2019 Amendments easily satisfy rational-basis review, as the District Court properly concluded. JA-224. To surmount this low hurdle, a law must be "rationally related to a legitimate state interest." *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997) (quotation marks omitted). Because "[t]here is no requirement that a law serve more than one legitimate purpose," *Preseault v. I.C.C.*, 494 U.S. 1, 18 (1990), a challenger must "negative every conceivable basis which might support" the law at issue, "whether or not the basis has a foundation in the record," *Heller v. Doe*, 509 U.S. 312, 320–21 (1993). Indeed, "when reviewing

[29] Appellants misconstrue (at 52) *Lingle* as endorsing the "substantially advances" standard for due process challenges to regulations like the RSL. In fact, *Lingle* rejected the "substantially advances" standard in part because this "heightened means-ends review" would "present serious practical difficulties," including requiring "courts to scrutinize the efficacy of a vast array of state and federal regulations" and "to substitute their predictive judgments for those of elected legislatures and expert agencies." *Lingle*, 544 U.S. at 545.

challenged social legislation, a court must look for plausible reasons for legislative action, whether or not such reasons underlay the legislature's action." *Beatie*, 123 F.3d at 712 (quotation marks omitted); *accord Heller*, 509 U.S. at 320 (holding that the government "has no obligation to produce evidence to sustain the rationality" of its laws). Thus, Appellees "need not produce evidence to sustain the [HSTPA's] rationality," and dismissal "prior to discovery" is appropriate. *Connolly v. McCall*, 254 F.3d 36, 42 (2d Cir. 2001) (cleaned up).[30]

Among the numerous legitimate purposes for the RSL broadly, and the 2019 Amendments specifically, are those identified in the RSL itself: the prevention of excessive rent increases and the avoidance of tenant displacement. *See* N.Y. Uncon-sol. Law § 8622. And as the Supreme Court has made clear, governments have a legitimate interest in furthering "local neighborhood preservation, continuity, and stability," *Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992), "protecting tenants," and "re-ducing the costs of dislocation," *Pennell*, 485 U.S. at 13, 14 n.8.

The 2019 Amendments are rationally related to these ends. As the State Leg-islature found, vacancy and high-income decontrol—neither of which existed until 1993—incentivized landlords to find ways to increase rents (through, for example,

---

[30] Although *Heller* and *Connolly* applied rational-basis review to claims under the Equal Protection Clause, the same standard applies under the Due Process Clause. *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015).

causing vacancies or implementing unnecessary MCIs or IAIs) to satisfy the rent threshold necessary for these decontrol provisions. *See* Hr'g on S. 6458 (June 14, 2019), N.Y. State Assembly, Regular Sess., p. 106 (Statement of Assembly Member Yuh-Line Niou) ("We have seen so many different landlords who have gone down the tenant harassment route because they know that they can collect a vacancy bonus, and … can up the rent until they reach vacancy decontrol …."). Vacancy decontrol, which triggered upon vacancy, incentivized landlords to pressure tenants, especially long-term ones, to vacate, and high-income decontrol removed occupied units from rent stabilization and incentivized placing high-income tenants in regulated units. *See id.* at p. 25 (Statement of Assembly Member Steven Cymbrowitz) (noting that "vacancy decontrol … has always been a tool that has been used to get tenants out.").

Appellants complain (at 12, 20, 49) about the elimination of eviction plans for condominium and cooperative conversions, as well as the increase in the voting threshold for non-eviction plans. But eviction plans resulted in tenants being kicked out of their homes. Eliminating those plans is plainly related to preventing tenant dislocation and keeping tenants in their homes. Appellants may disagree with the new voting threshold for non-eviction plans, but "the precise coordinates of" where the legislature sets the voting threshold are "virtually unreviewable." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316 (1993).

Appellants claim (at 49) that "there [is not] any basis for the [legislature's] removal of the sunset provisions." But the 2019 Amendments repealed only the sunset provision in the *enabling* legislation. *See La Guardia*, 53 N.Y.2d at 74–75 (noting that the statute containing the sunset provision "is an enabling act"). Municipalities must still find that a housing emergency exists to opt into the RSL, N.Y. Unconsol. Law § 8623(a), as twenty-one municipalities in Westchester County did, JA-150–51. In other words, the State merely shifted more power to municipalities to make local housing decisions. It is beyond dispute that the State has a legitimate interest in the allocation of legislative power.

Appellants' remaining arguments fall flat. They argue (at 49) that the RSL does not "provide affordable housing to low income families." But this is both legally irrelevant and factually wrong. Legally, there is "no requirement that a law serve more than one legitimate purpose," *Preseault*, 494 U.S. at 18, much less any particular purpose cherry-picked by Appellants. Moreover, Appellants' attempts to second-guess legislators' judgments about the RSL's efficacy have no place in rational-basis review. "[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data," *FCC*, 508 U.S. at 315, and courts "will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish." *Beatie*, 123 F.3d at 712. Courts may not "substitute their predictive

judgments for those of elected legislatures and expert agencies." *Lingle*, 544 U.S. at 544–45. In any event, the fact remains that eighty-six percent of the City's hundreds of thousands of rent stabilized units house low-, moderate-, or middle-income tenants, the vast majority of whom are low-income.[31]

Equally unavailing is Appellants' conclusory assertion (at 49) that the "use of decades old vacancy rates made without surveys" renders each and every municipality's finding of a housing emergency "imaginary." Appellants have not asserted any claims against any municipalities that have opted in to the RSL's protections. In any event, the Due Process Clause does not require that municipalities make *any* finding before exercising a broadly delegated right, much less the detailed finding that Appellants demand. *See Heller*, 509 U.S. at 320–21.

"[I]t is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as superlegislature to weigh the wisdom of legislation." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 124 (1978) (quotation marks omitted). Appellants' effort to second-guess the Legislature's reasoning ignores these fundamentals of constitutional law and was properly rejected.

[31] N.Y. State Assembly Standing Comm. Hous., *Public Hearing: Rent-Regulated Housing* 31:4–7 (May 2, 2019) (testimony of Elyzabeth Gaumer), *available at* https://bit.ly/3fdf5wk.

## VI. The Complaint Fails to Allege Any Violation of the Contract Clause

Appellants' claims that the 2019 Amendments' changes to prohibit increases to preferential rents beyond the RGB-determined rates violate the Contract Clause fail. Government action does not violate the Contract Clause unless it causes "a substantial impairment of a contractual relationship" and is not "justified by 'a significant and legitimate public purpose.'" *CFCU Cmty. Credit Union*, 552 F.3d at 267 (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)). Appellants did not adequately allege either element.

*First*, Appellants have not alleged any existing contract was impaired by the 2019 Amendments. As the District Court recognized, it has been "well settled for almost 200 years" that "the Contract Clause does not limit the ability of the government to regulate the terms of future contracts." JA-229 (quotation marks omitted). That is because "[a] contract … cannot be impaired by a law in effect at the time the contract was made." *Harmon*, 412 F. App'x at 423.

Appellants claim (at 55–56) that the 2019 Amendments affect existing contracts because the preferential rent policy "become[s] permanent for the existing tenant and continue[s] after termination of the 'preferential' period." They similarly insist (at 56) that preferential rents "chang[e] the contractual rent" and "interfere[e] with reasonable expectations of income [Appellants] contracted for." Such arguments are both factually inaccurate and legally wrong. As the District Court

correctly observed, renewing tenants "must sign new leases to continue their occupancy, and landlords can increase rents in those new leases by the amount set by the RGB or decline to renew the leases in certain circumstances." JA-231 (citing, *inter alia*, L. 2019, ch. 36, Part E; 9 NYCRR §§ 2524.5(a)(2), 2520.11(e), 2522.4(b) and (c)). These renewal leases are future, not existing, contracts, so Appellants' Contracts Clause claims fail.

*Second*, even if any of Appellants' existing leases were at issue—they are not—their claims would still fail because the 2019 Amendments would not constitute a substantial impairment of those leases. "[O]ne factor to be considered in determining the extent of [an] impairment is 'whether the industry the complaining party has entered has been regulated in the past.'" *Kraebel*, 959 F.2d at 403 (quoting *Energy Rsrvs.*, 459 U.S. at 411). Appellants are "involved in a heavily-regulated industry—rental of residential property in New York City"—and so "cannot claim surprise that [their] relationships with certain tenants are affected by governmental action." *Id.* (rejecting Contract Clause claim); *see also Energy Rsrvs.*, 459 U.S. at 413–14 (noting that it is "[s]ignificant … that the parties are operating in a heavily regulated industry" when assessing whether a law substantially impaired a contract). Moreover, the RSL prohibited increases to preferential rents beyond the RGB determined rates until 2003, *see* N.Y. Bill Jacket, 2003 S.B. 5693, Ch. 82; the 2019 Amendments merely restored the law to its pre-2003 status. The District Court

correctly concluded that "no reasonable expectations regarding rent-stabilized housing have been disrupted." JA-234–35.

*Third*, contrary to Appellants' contentions (at 25–26, 56), the 2019 changes to the preferential rent policy are justified by a significant and legitimate public purpose. The State Legislature amended the preferential rent policy to remedy the harmful effects of the RSL's 2003 amendment permitting rent increases to the maximum legal rent. *See* JA-233–34. The State Senate specifically considered that the 2003 RSL amendment had "put hundreds of thousands of tenants at risk of sudden and unexpected substantial rent increases. All too many … have been unable to pay the higher rents and been forced to leave their homes. Countless tenants have also been discouraged from raising concerns about conditions in their apartments and/or buildings because of fears this could lead to the termination of their preferential rents." N.Y. State Senate, Bill No. S2845A, Sponsor Mem., https://bit.ly/2xVpaL2; *see also* N.Y. State Assembly, Bill No. A08281, Chamber Transcript, https://bit.ly/2V3NPVC (noting that, because "the landlords have the right [before the 2019 Amendments] to go back to the legal rent … no tenant is going to want to ever make any demands of the landlord" and that landlords were "jacking up the rents to displace longtime residents").

In reviewing economic and social regulations challenged under the Contract Clause, "courts properly defer to legislative judgment as to the necessity and

reasonableness of a particular measure." *Energy Rsrvs.*, 459 U.S. at 412–13 (cleaned up). Where the preferential rent policy was enacted to advance the significant and legitimate interest of protecting tenants, the court should not "second-guess the [Legislature's] determinations that these are the most appropriate ways of dealing with the problem." *Keystone*, 480 U.S. at 506 (rejecting Contract Clause claim). Appellants' disagreement with the Legislature's reasoning does not give rise to a Contract Clause claim. The Contract Clause claim was properly rejected.

## CONCLUSION

The judgment of the District Court should be affirmed.

Dated: April 14, 2022

Respectfully submitted,

SELENDY GAY ELSBERG PLLC

By: /s/ *Caitlin J. Halligan*

Caitlin J. Halligan
Sean P. Baldwin
Michael Duke
Babak Ghafarzade
Sophie Lipman
Samuel Breidbart
Ekaterina Stynes
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

Judith Goldiner
*Attorney in Charge*
*Civil Law Reform Unit*
Edward Josephson
*Supervising Attorney*
THE LEGAL AID SOCIETY
199 Water St., 3rd Floor
New York, NY 10038
(212) 577-3332

*Attorneys for Intervenor-Defendant-Appellee*
*Community Voices Heard (CVH)*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Intervenor certifies pursuant to Federal Rule of Appellate Procedure 32(g) that this principal brief:

1. complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(e) and Local Rule 32.1(a)(4)(A) because it contains 12,632 words, including footnotes and excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 32(f); and

2. complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman.

Dated: April 14, 2022 /s/ *Caitlin J. Halligan*